ALEXINA WILLEY, appellant, v. RUDOLPH WILLEY, appellee.

No. 50642.

June 12, 1962.

Smith, Peterson, Beckman & Willson and Roy W. Smith, all of Council Bluffs, for appellant.

Ross, Johnson, Northrop, Stuart & Tinley, of Council Bluffs, for appellee.

LARSON, J.—The issue in this appeal is the right to custody of Rudolph, Jr., the son of these parties, born April 6, 1951. The plaintiff had been granted a divorce from defendant on March 23, 1959, on the ground of cruel and inhuman treatment, but under a stipulation approved by the court the defendant was to retain temporary custody of the child subject to certain rights of visitation in plaintiff until September 1, 1960. A few days before plaintiff filed her petition for divorce on July 1, 1958, defendant removed himself and their two children from the parties' home in Council Bluffs, Iowa, and had refused her the right to see the children. Court proceedings resulted in visitation rights, but defendant moved his residence to Albuquerque, New Mexico, in August 1959 and took the children with him. Rudolph visited his mother for six weeks in the summer of 1960 under the terms of the divorce decree modification above set out, and on other occasions in Albuquerque. Being dissatisfied with these arrangements, plaintiff filed her application for permanent custody of her son and, after an extended trial of that issue, the court held permanent custody should be given the father, and provided the mother should only have such "rights of visitation * * * as in the father's judgment shall be reasonable and proper for the best interests of the child." We agree with the custody award, but not with the discretion left in defendant regarding visitation rights.

Plaintiff's appeal places before us the most difficult and

perplexing problem involved in custody cases—that of whether one of the parties has a mental illness and, if so, whether it will be for the child's best interest to grant that parent custody or give him or her any visitation rights with the child. Courts are always saddened when such issues arise, for under the rule of doing what is best for the child, many otherwise faultless parents may be denied the close association of a home with their child. Bowler v. Bowler, 355 Mich. 686, 96 N.W.2d 129, 74 A. L. R.2d 1068, and annotation in 74 A. L. R.2d 1074.

Although we must give weight to the trial court's findings, and recognize the question of child custody is addressed to the sound discretion of the court, it must also be remembered that our duty is to review such a matter de novo and, where the record is so extensive as it is here, we must decide the involved questions ourselves. Andreesen v. Andreesen, 252 Iowa 1152, 110 N.W.2d 275, and citations; Patzner v. Patzner, 250 Iowa 155, 162, 93 N.W.2d 55, 59.

Although mental illness alone will not be sufficient grounds to deny a parent custody of a child, as we shall later point out, the big issue here seemed to be whether the mother was mentally ill, or so ill that she was unfit to have the custody of this nine and one-half-year-old boy. On that issue defendant produced two able and reputable psychiatrists, Dr. James D. Mahoney and Dr. William E. Ash, associates, of Council Bluffs. Both gave their opinions that the mother was suffering from chronic undifferentiated schizophrenia with marked paranoid tendencies. Both said that she could harm someone, that while she was getting along reasonably well, if she were thrown back into a close family relationship, her mental condition might again become worse, and that to return the child to her custody could be a disturbing influence to her. They were given lengthy and exhaustive examinations and cross-examinations relative to the basis of their opinions. Other evidence introduced by defendant consisted of depositions of Frances, a sister of plaintiff, now acting as defendant's housekeeper, and Dona, the couple's 17-year-old daughter who had chosen to live with her father. Their testimony as to plaintiff's actions and defendant's kindness to her was not subjected to cross-examination. An associate minister from Albuquerque, who had known the family about 2½ months,

testified that he had talked with the boy several times, had observed him in church, school, and among his classmates, and concluded that he was well, happy, well adjusted, and wished to stay with his father. Recent pictures and report cards entered as exhibits appear to corroborate his testimony.

On the other hand, plaintiff produced an able and reputable psychiatrist, Dr. C. H. Farrell of Council Bluffs, her family physician over the past several years, and a Catholic priest who had advised with her about her troubles over these years. They all gave their opinions that the mother was not suffering from schizophrenia or any other mental illness that would tend to be detrimental to the mother-son relationship. Doctor Farrell said, "I can see no reason why it will hurt or harm her son or daughter to be under her care." They too were given lengthy and exhaustive examinations by both counsel, but found nothing more than poor judgment in some of plaintiff's writings and statements, introduced as exhibits herein. From her frequent visits to psychiatrists' offices and reading books on psychiatry, it is not surprising that she should try her hand at psychoanalysis in writings attempting a reconciliation with defendant. Plaintiff's other evidence was given by her youngest sister Beverly and by nineteen neighbors who had visited back and forth with her during the past year, one of which had entrusted very young children with plaintiff for several days. None had detected any sign of mental illness in plaintiff. While that would not be unusual in slight mental illness, it would seem strange if her alleged ailment was indeed chronic or had marked paranoid tendencies.

Although nearly one thousand pages of the record is devoted to such testimony, it will not aid our opinion by detailed references thereto. It will suffice to state that plaintiff's testimony and many of the exhibits apparently had a twofold purpose, first, to prove that defendant morally was not a proper person to have the custody of the boy, and second, to prove factual many of the incidents which Doctor Mahoney and Doctor Ash assumed were delusional or fancied and indicative of mental illness. Her first purpose failed for the lack of substantial corroboration, but the second has substance. Doctor Farrell assumed, and the record to some extent sustains, the conclusion

that at least a few of plaintiff's accusations were well based, such as her announced belief that her sisters Frances and Julia were determined to have her committed as insane. Plaintiff has never been institutionalized as a mentally ill person, but these sisters did make such an effort, without success, just before plaintiff was to have the six-week custody of the boy in 1960. It is her contention that this was done when Frances had not seen her for about six months, and was indicative of a conspiracy between the sisters and defendant to prevent her from exercising her court-approved visitation rights. If that inference was proper, it would seem that her feelings toward her husband and those sisters were not delusions but were perfectly normal. In further denial of alleged delusional traits she maintains that what she had related as dreams were erroneously referred to as visions by defendant's specialists. Without further discussion of these fact questions, it is sufficient to say we are not only faced with inconclusive evidence as to the factors considered by the specialists, but also with the sufficiency of the factors necessarily considered to justify their conclusions of undifferentiated schizophrenia. Both Doctor Mahoney and Doctor Ash frankly stated that one or several of these factors may not add up to the conclusion that she had a mental illness, but when taken together justified their findings here. We do not question their sincerity, but are far from satisfied defendant's proof of serious mental illness is sufficient to deny plaintiff any custodial rights in her son, now over 11 years old.

Our problem is distressing, for in addition to having opinions by trained specialists that are in total conflict, we have violent disputes as to the factual basis of some of the express opinions as well as their sufficiency to sustain their findings. Most of the remaining testimony may be classified as partial. This places upon the court a most heavy and vexatious burden, one where doubts make a decision much less than completely satisfactory. We have often said in regular custody matters that a correct disposition of the case called for the wisdom of Solomon himself, and now to have such a mental illness element injected in a custody dispute makes the task almost impossible. Perhaps it would be helpful to have the aid of one trained in psychiatry, as a friend of the court, who on behalf of the state

would examine the parties and give his impartial opinion as to the seriousness of any mental illness in custody cases. We have no such aid here, although Doctor Ash was appointed to examine plaintiff pursuant to defendant's application.

■ ■ I. It has been well established in all jurisdictions that the court gives paramount consideration to the best interest of the child, and the desires or wishes of the parent are not controlling in custody disputes. Stillmunkes v. Stillmunkes, 245 Iowa 1082, 1086, 65 N.W.2d 366, 369, and citations. Under the circumstances revealed by this record, what disposition is for the best interest of the child? It is not disputed that it would not be for the best interest of a child to place him in the custody of one afflicted with a serious mental illness. Andreesen v. Andreesen, supra; Annotations, 74 A. L. R.2d 1073, 1075. But it is also true few persons do not at some time exhibit traits or feelings that depart from the norm, and to deny custody of a child to a good and loving parent on that basis would be unjust if not ridiculous. Slight mental illness, or an arrested case in one found to be mentally ill, will not per se disqualify that person as a proper custodian of children. McKay v. McKay, 253 Iowa 1047, 115 N.W.2d 151; Guiles v. Guiles, 41 Wash.2d 377, 249 P.2d 368; Surrey v. Surrey (Ct. of App. D. C. 1958), 144 A.2d 421, 423; Hitchcock v. Hitchcock, 1960, 220 Ore. 112, 349 P.2d 254; Nelson, Divorce and Annulment, Volume 2, Second Ed., 1961 Revised, section 15.26, page 274.

Regardless of the basis for allowing defendant the temporary custody of Rudolph (it was done by stipulation, and no presumptions are attached to it), he has now been with his father over three and a half years and has become well adjusted to his surroundings at the paternal home. While the evidence that his present home and the relationships therein are good is not strong, it is not seriously disputed, and we are satisfied that at this time it is a proper one for the boy. He ranks high in his class at school, is a class officer, and attends church regularly. His health record is very good. Judged by his school absence record, it is somewhat better than when he lived in Council Bluffs. He appears happy and content, and there is nothing to indicate any substantial detrimental influences are present. Regretfully, there is evidence which would indicate

both of these parents have done things and said things not intended to increase the love of their son for the other parent, but perhaps this is not unusual or entirely unexpected. Both deny such was their intent, and we give to this evidence no special significance. The proof is not sufficiently clear to deny custody or visitation rights upon that basis.

■ The trial court, exercising its broad discretion, had ample basis for its conclusion that the permanent custody of the boy should be placed in the father and that it would be for his best interest that he remain with the father. We agree with that determination and affirm the decision in that regard.

II. However, the conclusion that plaintiff is not a fit and proper person to have the care, custody and control of the minor son, or is not a person of sound mind, and that she is suffering from a mental illness that would make it harmful to the minor son to be placed in her care and against his best interest, all as set out in paragraphs 8, 9 and 10 of the trial court's findings, we think, is not clearly or satisfactorily established. Even the defendant does not seriously contend that is the fact, or contend that it is necessary to a decision in this case. Furthermore, the provisions in the decree that plaintiff's rights of visitation shall be at the discretion of defendant as in his judgment shall be reasonable and proper for the best interest of the child is erroneous and cannot be sustained.

■■ It has often been stated that the love of a kind and good mother is most beneficial to a child, and that during tender years children are usually best cared for by their mother. Blundi v. Blundi, 243 Iowa 1219, 1230, 55 N.W.2d 239, 245. In Nelson on Divorce and Annulment, supra, section 15.08, page 226, it is stated: "Mental illness of a parent may not require the parent to be deprived of the custody of his or her child when it appears that the health, safety and welfare of the child will not be jeopardized by permitting it to remain with its afflicted parent." This is especially so if the parent's behavior had been normal for a considerable period of time preceding the award of the child's custody.

In the instant matter there was little to show the health, safety or welfare of Rudolph would be jeopardized by granting

the mother custody, but there is evidence his health has been better at his father's home and that his general welfare would be best served by allowing him to remain in the place he has lived for the past three years. But this does not mean there has been sufficient proof that the mother is unfit for his custody or visitation. We think the evidence is substantial that Rudolph has been well treated and happy when left alone with his mother.

Although now over eleven years of age and certainly not in need of infant care, this lad or any lad still needs to know, appreciate and love his mother and, if not given that opportunity, will miss one of the better things of life. Proper visitation rights will provide this opportunity. Jackson v. Jackson, 248 Iowa 1365, 1376, 85 N.W.2d 590. Unless there is danger to *him*, and we find no such evidence in the record, it may be most unfair to deny him the privilege of spending some time with her. There is no evidence plaintiff has ever mistreated Rudolph, Jr. or has evidenced any ill will toward either of her children.

█ III. The rule is well established in all jurisdictions that the right of access to one's child should not be denied unless the *court* is convinced such visitations are detrimental to the best interests of the child. In the absence of extraordinary circumstances a parent should not be denied the right of visitation. It is a right which, unless specifically denied by the court, can be enforced by right of habeas corpus. Nelson on Divorce and Annulment, supra, section 15.08, page 226, and section 15.26, page 274; Townsend v. Townsend, 205 Md. 591, 109 A.2d 765, 768; Commonwealth ex rel. Firestone v. Firestone, 158 Pa. Super. 579, 45 A.2d 923.

█ The feasible exercise of a parent's right of visitation should be safeguarded by a definite provision in the order or decree of the court awarding custody of the child to another person. Walden v. Walden, 250 Ky. 379, 63 S.W.2d 290; Chadwick v. Chadwick, 275 Mich. 226, 266 N.W. 331; Perr v. Perr (Mo. App.), 205 S.W.2d 909.

In Nelson on Divorce, supra, section 15.26, at pages 274 and 276, it is stated: "The right of visitation is an important, natural and legal right, * * *." The right should be recognized by the court in custody cases and the "order should not make the

right of visitation contingent upon an invitation from the party having the custody of the child, or require the consent of one parent for the other to visit the child, * * * thereby leaving the privilege of visitation entirely to the discretion of the party having the child in custody." On this proposition many late cases are cited, including McCourtney v. McCourtney, 205 Ark. 111, 168 S.W.2d 200; Clark v. Clark, 177 Okla. 542, 61 P.2d 28; and Sweat v. Sweat, 238 Iowa 999, 29 N.W.2d 180.

In Surrey v. Surrey (Ct. of App. D. C.), supra, 144 A.2d 421, 423, a case decided in 1958, in a proceeding on a motion to reinstate visitation rights which had been suspended on the father's motion when the mother was admitted to a hospital for a mental examination, and was found to be of unsound mind and was later discharged as cured, the court said too much importance was given to that discharge, that the issue was as to her present condition and whether visits with the children would or would not be in their best interest. It stated that the burden was on the father to support his claim that the mother's present condition was such that the visits would not be in their best interest. That was the concernable issue involved, and the sound or unsoundness of the mind of the mother, although entitled to consideration, was not determinative of that issue. It said: "Even if the mother is mentally ill, this would not ipso facto deprive her of the privilege of seeing her children", and that "when custody of children has been awarded to one parent, the parent deprived of their custody has the right of visitation with the children and ought not to be denied that right unless by his conduct he has forfeited his right, or unless the exercise of the right would injuriously affect the welfare of the children."

Obviously, in the instant case the trial court did not find either of these exceptions applicable, nor did it deny all visitation rights to the mother. By inference they were approved, but as to the times and places of visitation, discretion was left with the father. That cannot be done. Under this record we are satisfied plaintiff should have reasonable visitation rights and that they should be established by the court.

■ In this connection it is noted that by stipulation prior to the hearing on this matter the parties and the court had agreed the mother should have the boy at her home for a six-

week period during the summer vacation and that she should have certain hours of visitation with him at Albuquerque during the Christmas vacation. Except for outside interference during the first four weeks, they were exercised without difficulty in the summer of 1960. Unsupervised visitation rights, under the conditions now evident, appear reasonable and proper, and unless at some future time the mother exhibits some harmful tendencies toward the boy she should be granted a three-week visitation right in her home at the close of the school year, and the hours of visitation during Christmas vacation as provided in the prior stipulation. The trial court is directed to enter a modified decree providing such reasonable visitation rights in plaintiff in conformity with this opinion. No further hearing is deemed necessary, and it is so ordered.—Affirmed in part and remanded with directions.

HAYS, THOMPSON, THORNTON, and SNELL, JJ., concur.

GARFIELD, C. J., and OLIVER and MOORE, JJ., dissent.

PETERSON, J., takes no part.